Good morning, Mr Kirkham. Whenever you're prepared and ready. Good morning, Your Honor. My name is Bruce Kirkham. I represent the defendant, Mr. Nicholas Martinez. Mr. Martinez was convicted of a jury trial of attempt murder and other charges and sentenced to 26 years in prison. The conviction stemmed from an incident in which the defendant fired gunshots in an occupied SFOR utility vehicle. The defendant testified at trial that he fired the shots in self-defense after the driver of that vehicle accelerated at him. The trial court allowed self-defense instructions at his trial, and the defendant's testimony was countered by a statement to the police in which he did not explicitly invoke self-defense. And Mr. Martinez now appeals from the denial of his pre-trial motion to suppress those statements. Mr. Martinez was severely injured when this vehicle ran over him, and the list of injuries he suffered is, quite frankly, staggering. He suffered a fractured femur, a dislocated and fractured hip, fractures to both humerus bones, a fractured forearm, numerous fractured ribs and a bruised lung, and a possible concussion. Despite these traumatic injuries, the Belvedere Police Detectives interviewed the defendant two times in this room in the Neurotrauma Intensive Care Unit of St. Anthony Hospital in Rockford. But he was not in custody at that time, correct? There were no guards outside the door? He hadn't been arrested? That is correct. He was not charged at that time. There were no guards. You know, if you look at people versus Sandra Vasquez and Christina Beltran, this court has considered that question before about hospital interrogations and found that those are not custodial. Well, let me guess. Your position is going to be it's a red herring, because even if he wasn't in custody, the voluntariness of the law still applies. Absolutely, Your Honor. That is exactly the argument that we bring to this court this morning. It's axiomatic that all statements to police to be admitted in a trial must be voluntary. Okay, now there are references early on, I guess, in that first conversation that they had with him, that while he was in bed and he was immobile, he was able to speak. That would be pretty objective. You can speak. He was alert, might be a bit more subjective, and was oriented to date, time, and place. Is there anyone other than the actors here, the defendant and the two police officers that testified to his circumstance on the day of that first incident or first discussion? His girlfriend was present at his room on the first day. The police aren't there on two different days. The first day, his girlfriend was there. They asked her to leave, and she complied with their request. So at the time of the actual, the first day interview, it was just the defendant and the two police detectives, Damon and Wallace. Did Ms. Bynes ever, is it Bynes, I guess? Yes. Did she ever testify about his, about what he was like, that he was coherent, that she could understand and things of that nature? She testified that he was continually sleepy, he was confused, and he had difficulty carrying on conversations. And she also testified that at that time, he was undergoing various operations to repair his multiple orthopedic injuries. In fact, the day of the first questioning, the questioning was cut short because he had surgery that day. And she testified, his girlfriend testified, that after all the surgeries were completed and he was able to rest a little bit, his coherence returned. But at the time of the two interrogations, his girlfriend said he was, had great difficulty just carrying on conversations because of drowsiness and sleepiness. His mother, who also was a resident of the area, was present for much of the time in his early days of his hospitalization. And she testified his level of awareness was, she described it as off and on, or on and off, whichever it was. She testified to an incident in which he was confused about identities of family members. There was testimony from two people close to him who had spent a considerable amount of time with him in those hours after his injuries that said he was not, you know, what we would consider to be coherent and able to- Well, let me ask this. And the prosecution points to this in the brief. They're saying the defendant was able to hold a 40-minute conversation with the police on February 21st. And during this conversation, the defendant initially lied about what happened. And then he states, I'm going to stop lying. Did he make that statement? That's the testimony of the police officers that he made that statement. If the trier effect were to believe that, wouldn't that bear in his consciousness and orientation? If he's aware enough to notice that he's lying or saying, okay, I'm going to stop lying now, doesn't that bear in voluntariness? Not necessarily. I think the voluntariness is his will overborn to say these things. There's a test of voluntariness, of free will. Did he make the statements? But if he makes a free will, my logic is if he says, okay, on my own free will, I'm going to stop lying and tell the truth now. Okay. Obviously he must be coherent and conscious enough to recognize that he is lying and make the conscious decision to tell the truth. A person who's totally incoherent is going to be able to do that. Was his will overborn at the time that he began making those statements? And the answer to that question is yes, it was. By what? By his severe injuries. He was being administered strong painkillers. He had blotted being administered intravenously. He was taking Norco orally. He was being prepped for surgery that day. And none of this is disputed in the record, right? No, that's not disputed at all. But those certainly are factors that you have to consider in the totality of the circumstances in voluntariness. So you're saying anytime someone is on that type of medication, that the statement they give can't be voluntary? I would not go that far. I'm not here today to say that a hospital interrogation is per se involuntary. Hospital interrogation with medication? I would not go that far. I would argue that every case is unique. Every case has to be determined on its facts under the totality of the circumstances. So what is there about this particular case that changes? Well, the analysis here is when the defendant filed his motion to suppress, the burden was on the state to prove that his statement was voluntary. So there are things that the state, or excuse me, the detectives could have done to ensure that. They didn't even care what drugs he was taking. The defendant told Detective Damon that he was taking painkillers intravenously. He was asked, did you consider what those were? Did you find out what those painkillers were? Damon said, no, he never bothered to even find out what drugs the defendant was being administered. Detective Wallace went even farther and said he didn't even know if the defendant was on painkillers, which is quite striking when you consider the injuries this man had. And the detectives who are there to take his statement are unconcerned about finding out what his mental state is, and it's caused by the IV dripping into his arm and the medications that he's taking. So the prosecution is required to prove that the statement was voluntary by a So how many police officers testified that it was voluntary? There's two, the two detectives who were present, Damon and Wallace. And the girlfriend testified and said what? That she was asked to leave and that at the time that he was interrogated on those two days he was drowsy, couldn't carry on conversations because he was he was continually falling asleep with sleeplessness. That's not a portrait of a person who is possessed of his faculties to sufficiently waive his rights and make a voluntary statement. Were there any medical personnel that were subpoenaed to testify as the defendant's condition during the giving of the statements? Two doctors, the doctor who was the trauma and general surgeon who had his primary care in those early days and also a pain management physician testified. Would they testify to the thorn voluntariness? They testified that they testified to the side effects and the effects of these drugs in addition to addressing the immediate issue of an immediate purpose of pain that could cause confusion, drowsiness, sleepiness, weakness. They said we don't know exactly what the condition of this patient was because every patient responds differently. But don't read too much into that. I don't think that it's fair to infer from that that because we can't point to specific side effects suffered by this particular defendant at those times that he was not feeling those effects. That's the nature of these drugs. They're powerful drugs designed to kill the pain of having multiple, you know, orthopedic fractures and injuries. So to ask you a pointed question then you've got the police over here, you've got the defendant and you've got the doctors pointing out the general effects, but they sort of qualified it, I guess you're saying, by saying, well, if the effects are different every patient, we can't say definitively. So how is the preponderance not met? Police didn't care what his condition was as long as he was able to make a statement to them. They testified they didn't even bother to find out what medications he was taking. How can they know what his emotional and medical and mental condition is when one detective just remains oblivious to the fact of whether he's even taking painkillers or not? But what about their interaction with them? Wouldn't that give them information about whether or not he was oriented, he could converse, he understood what was happening? What they first did, I believe, was advise him of his Miranda rights. And so that was a process. Would they have been alerted then? You know, when the police and the state have the obligation to meet its burden of proof to show that these were voluntary, and you are dealing with a suspect who's in this condition, they should be required to take basic elementary steps to ensure that he is fully possessed of his faculties and able to make that decision to waive his rights and to speak to them. So, excuse me, if they had inquired as to what medications he was on, are you saying that once they knew it was Dilaudid and, what is it, Norco, then they would have had to stop immediately? I'm saying that they needed to investigate or to find out the effects of those and to be aware of that rather than just pretend that it's not happening so that they can continue with their interrogation. So they would have been, you're saying, should have, they found that out, they should have asked the nurse, asked the nurse how he was doing on this medication, is that it, and then decided, based on that information, whether or not they could question it? There certainly are steps that they can take. That would be one step they could have taken. They could have had discussions with the defendant about the effects. How are you feeling? What are you taking? Are you dizzy? Are you confused? They testified he's awake and aware. I'm not sure that that takes us where the state needs to go here. Did they give him something to read? Did they say he read it? Did he read the Miranda warnings with them or did he read something? I believe the first day that they were there, they read him verbally the warnings. The second day they had a metal clipboard with a rights form on it that he initialed each right as they placed it on his chest. But again, you know, his rules of reform were, given his physical condition, they got him signing papers on a clipboard with two broken arms, a broken hand, a broken forearm. You know, we talked about Vasquez and Christina Beltran cases. You know, in those cases, those were hospital interrogations. Those were recorded on video. I understand that it's not required because no one was shot here. It's not a murder case. The videotape is not required. But in those cases, you know, a reviewing court, the trial court, can view the video of the interrogation of the interview and see for yourself what the condition of the defendants in those cases were. That's another step that the state could have taken here. If you're going to a hospital, your own trauma intensive care unit to interview someone, that should raise a red flag that you need to do more than get the guy to agree to... And you were saying you need to investigate the medication or what? I'm saying that that's one possible step that the police could have taken to ensure and to meet their burden of proof. How would they sign this out? And maybe I'm getting too far afield here, but aren't there some HIPAA violations? Can the police show up and say, the doctors tell us all about the medications he's on and all of these effects? Do the doctors have to tell them that? They can ask the defendant. If he's coherent and awake and aware and oriented, ask him. And let's assume that they knew what medications and painkillers he was on. How are the police going to know the effect necessarily? And the patient, when you affect the different individuals at different times. So let's assume the police knew everything that he was on and he was on a number of medications. Without talking to him and engaging as Justice Senoff said in the conversation, what do they make their decisions on? Well, he's on painkillers, we can't talk to him? What's the alternative? I suppose the alternative is anything goes. You get somebody who's badly injured, you can just go in and interview them. No, but I think it would have to be on what their interaction with him and assessing it at the time. If the guy is mumbling and stumbling and going in and out of sleep and can't talk, well then obviously he can't talk. But I guess I was just trying to figure out, just knowing the medications, how would that in and of itself tell them how coherent he is without actually sitting down and talking to him? If I may continue, you have to take that into account. It shouldn't be enough to be able to go in and go, he's awake and he's talking, but that doesn't mean that he's in control of his volitions and that he is able to voluntarily waive his rights. The burden is on the state here. It's not the defendant's and it's not a, you know, they ask his girlfriend to leave. They didn't talk to her about how he was. There's no indication in the record that says he okay, or is he coherent? Is he talking to you? Does he recognize you? You know, this, this would go in and just do the bare minimum that this, the detectives did here of, of saying, will you talk to us? And then taking the statement, it should not be enough. It's the state's burden and we have to hold him to that, especially in these cases where we have seriously, severely injured suspects. And we're going to the hospital and your trauma intensive care unit and spending two hours with them, less than 24 hours after he's undergone surgeries to repair these injuries to his arms and his legs and his hands. And to say, nope, that's close enough to voluntary for us that we need to hold police to a different standard. There's things that the police can do to establish and to be able to go into a court and prove and meet their burden and show that he was coherent enough to waive his rights and that his stigma was voluntary. They didn't do that here. Your honors are to apply a de novo review to the ultimate question of whether or not it was voluntary. So you reviewed de novo, whether the state met its burden. And I'm arguing that he, the state did not meet that burden. You should look at this and say, they just went in there and did the bare minimum. They got him to sign this form and that's all they did. They didn't even take the time or the, or expend the effort to, to learn what medications he was on, what possible effects they could have. That's, that's like willful disregard of his condition when they're, when they're interviewing him about it. Mr. Kerr, let's talk briefly about the note that was supposed to be, according to some of the witnesses was posted on the 21st, which would have been the first day they came to talk to him. Should we, you know, how should we do that when we, we don't, we don't see it. I mean, nobody saw it. I mean, some disinterested people didn't see it on the 21st. The police officers certainly testified they didn't see it. So when did Ms. Bynes say she put it there? Was it before the police officers came or after the police officers came? Her testimony was, it was there before the police officers came. And that's a little different question than the voluntariness. That's an indication of to remain silent, to write to counsel. I did not make those arguments before this court that that should result in the suppression of this. I'm focused on the voluntariness of his statements that were made to the police. Thank you, Your Honor. Thank you. You'll have an opportunity for reply. Thank you. Ms. Verpeil? Verpeil. Thank you. Good morning, Your Honors. Good morning, counsel. I may please the court. My name is Joanne Verpeil and I represent the people in this matter. We respectfully ask this court to affirm the two points that people would like to correct. First, Justice Hutchinson, you asked if there were third parties that made any sort of comments or testimony regarding the defendant's condition. There was the nurse who, his nurse who treated him in ICU, who stated that she saw him once an hour on both February 21st and February 22nd. And she testified that the defendant was awake and alert every time she saw him once an hour on those two days. The girlfriend, on the motion to suppress hearing, she did state that the defendant could not hold a conversation and he was not always awake. But at the trial, Your Honors, she stated that he could hold a conversation those days and was able to recognize her. Third, Your Honors, with regards to the doctor's testimony, both doctors were treating the defendant during that time and both testified to the medication that the defendant was taking. One doctor testified that if it was obvious that he was experiencing any side effects, it would have been obvious to the person questioning him or observing him or around him. But that doctor testified that there was nothing that stood out during the period of February 21st or February 22nd that showed the defendant was experiencing any side effects. Second, Your Honors, a second doctor, the pain management physician, stated that he did not know if any side effects the defendant was suffering at the time. The people believe, when looking at third parties not interested in this, Your Honors, stating that the defendant was awake, alert, there was no testimony that he was experiencing any side effects of confusion or sleepiness or drowsiness, that the defendant's statements on February 21st and 22nd were voluntary. So you're saying there was nothing that really corroborated the defendant's testimony that he was incoherent and statements were not voluntary? Correct, Your Honor, there is no testimony really to corroborate that. There is testimony showing that he was awake, he was alert, he wasn't slurring his words, he was able to read a six-page detailed written statement made that he made to detectives on February 22nd. He was able, as Justice Hudson pointed out, on February 22nd, when looking at the written certificate that he initialed, giving up his rights, and then the six questions afterwards, initialing the correct boxes, and then signing at the bottom, saying that he understood that these are his rights, he's giving up his rights, that he's making a free and voluntary statement right now, Your Honors, and he signed that, and then both detectives signed that, and then he proceeded for the next two hours or however long after certificate to make a statement to these detectives, detailing the events of February 18th, detailing his or his position in the Latin Kings, and then the hierarchy of the Latin Kings, Your Honors. After making that statement, it then was the detective Damien Witt printed it off, brought it back to him, and he read those statements, all six pages of those statements, and signed it, made no corrections, made no edits, and did not ask for it to stop, did not ask for any attorney, didn't ask for his parents to be present, or his girlfriend to be present, which as defense pointed out, were in the hospital. Well, maybe he wasn't capable of doing that, given the degree of pain that he was in, and the proximity to the injuries he had suffered. Well, the people would assert if he is able to give up his rights, make a six-page statement, make detailed statements in that six-page statement, he should be capable of saying, I don't want this, or I want an attorney, or I want my parent. Well, how do you respond to counsel's argument, really, that his will was overborne by the fact that he was in the intensive care unit, that he was in a lot of pain, that he was on this heavy-duty pain medication? How do you respond to that? Well, the pain that, excuse me, the way you made it sound, you know, he could have been in the cafeteria doing this, as opposed to, you know, being in a neuropsych unit, not psych, neurointensive care unit. Yes, Your Honor, and the people recognized that the defendant was in an ICU, and that he had serious injuries, and that he did have pain medications to assist him with those injuries, and after that surgery. But to say that his pain was so much that he wasn't able to sit for two hours to make this written statement is to go contradictory to what he actually did with these detectives, Your Honor. He was able to have a clear and open conversation with them. Even both detectives testified that he was cooperating, that he was being able to speak with them clearly. He answered the questions appropriately. The fact that he was on medications, Your Honor, is the people would assert actually assisted him with his pain. The point of these pain medications is to make sure that he isn't experiencing the kind of pain that defense is alleging here that is so much and so overbearing that he is unable to speak or make statements or make any sort of, I guess, any sort of verbal statements at all. The people would assert that the pain medications actually were assisting him to be able to make these sort of statements. Well, shouldn't the state have elicited that kind of testimony in order to meet its burden here? Well, the testimony that the state did provide were the two physicians that testified that the defendant was on these pain medications, but nothing stood out that he was experiencing any sort of side effects, that he was experiencing drowsiness or sort of issues. Did they testify how often they saw him during those periods of time? The pain management specialist did not see him during February 21st and February 22nd. And then other physicians said he did see him on those days. He was the one initially treating him when he first arrived at the hospital. And he said that when seeing the defendant on February 18th and February 21st, there was nothing, between February 18th and 22nd, nothing stood out during that period that would have made, in giving notice to this doctor that the defendant was experiencing any sort of side that were so extreme to make him forget seeing two detectives on February 21st and 22nd, in giving any sort of verbal statement or any written statement. Did the doctor who did see him, not the pain medication doctor, but the doctor who did see him, did he relate that they actually had conversations then, or was he just checking chart, checking with nurses, and maybe the defendant was actually sleeping during those encounters? I don't believe the record is clear on that, Your Honor, with regards to if the doctor spoke to the defendant about his medical condition. So I'm unsure about that. I'm sorry, Your Honor. So what would the problem be if the police officers walked in? I'm visualizing an intensive care unit, which usually has a lot of Why, you know, why isn't there some, I don't want to call them pleasantries, because under the circumstance, this would not be very pleasant. But, you know, do you know who we are? How are you feeling today? You know, what's going on? What would be the problem with that by the police, assuming that they weren't also had, they didn't also have a degree in pharmacology to know exactly what these drugs were capable of doing? There's no issue with that, Your Honor, in argument's sake to go up and ask, how are you doing? What's going on, Your Honors? But in this case, the two detectives spoke to a nurse prior to even interviewing the defendant and asked that nurse if they were capable or able to speak to the defendant, if he was even able to speak to them. That nurse then went to the social worker, Teresa Cook, and she stated as long as there's no medical concerns or medical reasons, she doesn't see any reasons why these detectives couldn't come to speak to the defendant. Well, don't we assume that intensive care implicates serious issues or medical reasons? It implicates serious injuries or a serious concern for dealing with injuries immediately, but it doesn't rise to the level of he's not capable of giving any sort of conversation or giving any sort of statements, Your Honor. Are you aware of the United States Supreme Court case of MnC versus Arizona? Yes, Your Honor. How do you distinguish this case from the MnC case? The people distinguish that case, Your Honor, because in MnC, the defendant was connected to multiple wires, having a catheter in his stomach. He had a breathing tube, a feeding tube. He was going in and out of consciousness. He really wasn't even able to speak, Your Honors, and moments later, detectives came that same day to speak to him and asked him to write out his answers. He couldn't verbally say anything, so he had to write it out, and while he was writing out his answers, he stated, I wish for this to stop. I don't want to make any more statements, and then they continued to proceed. That is completely distinguishable from the facts here, Your Honor, where the defendant was able to speak. He was verbally able to say, I don't want this to stop. I don't want to make any more statements. I don't want to make any more verbal declarations, Your Honor. Furthermore, the injuries are not similar to the one in MnC. The defendant, yes, has had some serious injuries to his hands, his arms, and his feet, but he's not at the state of MnC. Furthermore, Your Honors, in MnC, the defendant was going in and out of consciousness. He wasn't even able to answer questions appropriately, where here we have testimony that the both detectives and by third-party nurse who saw him every hour. Furthermore, Your Honors, the people would like to correct one other issue with regards to the detectives not caring about the drugs. As pointed out by Justice Zeno, he did speak to nurses, or the two detectives did speak to nurses prior to speaking to the defendant, and then those nurses made it seem or indicated to these detectives that they could come and speak to the defendant in this case. So there was no disregard by the police officers with regards to the defendant's care. Rather, they came here three days later to find out what happened on February 18th. As stated by the defendant, he was ran over. He shot out of a vehicle. This four-truck ran him over, and he ended up in the lawn of a neighbor or in a neighbor's lawn with serious injuries. So three days later, these officers were concerned, not just being a suspect, but he was possibly a victim. So they came to question him. This was no disregard to his health. There was no disregard to his well-being, but rather trying to find out what happened on February 18th. Well, they were concerned that he might have, you know, been a victim, but they let him talk for a while and said, oh, by the way, the gloves you were wearing had gunshot residue on them. What part of being a victim would that be? That's just asking appropriate questions to the incidents, Your Honor, because the gloves were found. Gunshot residue was found on those gloves, and they were asking him, where did they get this? Where did he get that? They asked him, did you shoot a gun that day? He said, no. He said, why is there gunshot residue? He said he shot him earlier that day. They were trying to understand the circumstances with regards to the gloves that they found at the scene, the gun that they found at the scene, the shells that they found in the car, and the gun in the ground. They had to sort of investigate further by asking these kind of questions to find out how his gloves with residue plays into the incident that happened on February 18th. When police characteristically go to interview victims, do they let people stay in the room, or do they ask everybody to leave? Although there was only one person there allegedly at the time. Well, allegedly in this case, Your Honor, the defendant, the girlfriend stated that she was asked to leave, but both detectives stated that she was there and she left on her own accord. But Detective Damon stated that if she would have remained, he would have questioned her, or he would have questioned the defendant no matter what. So even if she would have remained in that room, questioning still would have happened because they were investigating what happened three days prior. Was she, was there any indication that she was in one of the vehicles at that particular time, three days prior? No, Your Honor. There's no indication that the girlfriend was in the vehicle. If there are no further questions, Your Honor? No. Thank you. Thank you. Mr. Kirker. Thank you, Your Honor. A few brief points. The fact that the detectives spoke with nurses at the hospital should not be the determinative factor on whether the defendant's statement was voluntary or not. You know, let's not make the nurses the gatekeepers of voluntariness that we put a decision on. They didn't know what the, the nurses can't have known what the detectives wanted to do. They wanted to visit him and try to get an incriminating statement from him or that they were not aware of his condition. I mean, he's present in his room. You can speak with them. Let's not make the nurses the gatekeepers here. Well, I mean, I thought the purpose of having him testify was other indicia of what, if any, effect the drugs were having or his medical condition might have on his ability to talk to anybody, including police officers. I mean, the nurses testified, we checked on him and we were doing our work, our routine work, but I don't recall them offering substantive testimony about his, his emotional state at the time. You know, his emotion, are we talking about his emotional state or whether he was awake and alert and capable of exercising his will? Your point is well taken. I shouldn't have used the term emotional state because that's not what we're talking about here. We're talking about his ability to voluntarily make a statement to police and that's outside the realm of the expertise of the nurse here who basically can say, you're invited to go in and see him. There's no reason, you know, he's not in surgery right now, there's no one performing procedures on him, they're not changing his bedding or anything. It's simply, yes, he's available in this room right here. Well, didn't the state indicate that the testimony from the nurse was, yes, he's awake and alert? I mean, that's different than saying, you know, he's in the bed and I'm checking on him once an hour and you can go in. They got information from the nurse regarding his ability to communicate. Awake and alert indicates his ability to communicate. I would make the argument that awake and alert to a nurse is a different standard than awake and alert to a police detective who's there to take a voluntary statement. Awake and alert could mean to a nurse, he's awake, he's able to respond however minimally to commands and questions. That's a whole different question than is he possessed of his faculties to the point where he can voluntarily make incriminating statements to police. That's an interesting line to try to draw. I mean, where do you draw that line? I mean, that, when you really think about what you just said, that's, I don't know how anybody would draw that line. At what point in this factual situation can you make that conclusion? I would just argue that, you know, the fact that the nurses or a nurse said that he's awake and alert and there's no reason you can't go in and speak to him should not be the determinative factor of his voluntariness of this statement. It is a factor, correct? You can consider that I learned, I apologize, so I wouldn't say that it should be minimal weight. Minimal weight to that is what I would say. If the police officers had testified that we were there for about 40 minutes and he fell asleep, but we waited it out and talked to him, I could see that as being a different situation, that now there is some physical indicia of the problem. There was no testimony to that effect, was there? That during this period of time when they were with him on either day, until we get to the end of the second day and it had gone longer, there isn't anything like that in their testimony, is it? No, there's nothing about having to take a break and come back and complete the interview. Were they ever asked in the trial court to describe the scene as they walked in, to describe what they saw that would indicate the injuries or were they just aware that he had been severely injured from other police who had investigated and they had either conversed or read reports? I don't recall any specific testimony of scene setting, of description of equipment that was present or anything like that, other than he was being administered intravenously, diluted. If I may respond to a couple of more quick points here, Your Honor. The State said that the purpose of the medication was to get the defendant into a condition where he was in a position where he could make these statements. I would say that the purpose of these medications is equally plausible and reasonable to say that the purpose of these medications is to mask all of his pain and his symptoms and to put him in a state of consciousness where he's not able to waive his rights and to become able to make a voluntary statement. Well, assuming he wasn't being overdosed, there wasn't an overdose, so we don't have any indication of that, there is a purpose these opiate-based drugs have a purpose to deaden or mask the pain, but is there anything that says that in masking the pain they also mask free will? I mean, is there any evidence or any science that says that that's the case? Well, there's testimony of the doctors of the side effects of these medications. That those are possible side effects for possible people. I mean, when I had surgery on my hand, I took Norco and I had nightmares, but nothing affected me during the day other than I didn't like the way I had nightmares. So, I mean, what science says that in this case, because his pain was controlled, he also was impaired in other ways? I think the testimony of the doctors was these are side effects of these medications, but we can't know exactly what combination or to which degree they affected this particular defendant because they affect everybody differently. It's almost like consumption of alcohol. It creates a euphoric, relaxed feeling, but the possible side effects are dizziness, disorientation, lack of judgment, and so forth, and it's different in every person who has a drink, but we still are able to say that that person is under the influence of alcohol. I mean, these are powerful pain-killing drugs that I don't think it's reasonable. I would submit to your Honor with due respect that it's not reasonable to say that the only thing that these drugs did in this case was to manage pain. I think that there's a testimony from the doctors to say these are side effects, and we just don't know how intense they were. It doesn't mean they didn't exist at all. Lastly, I'd just like to point out in Mincy, you know, the state, the defendant in Mincy did tell the detectives that he held on the wish to speak with them, but the U.S. Supreme Court, they also addressed his physical condition there and said that they couldn't imagine a less conducive, or actually, let me make sure I got this right, said it's hard to imagine a situation less conducive to the exercise of a rational intellect and a free will. I mean, that goes beyond, that's addressing his physical condition and how it relates to his ability to have his will overborne to be extinguished. But there was, in that particular case, some testimony about the different hookups and all the different things that had been observed just by a common person walking by his room, looking and going, well, that's pretty bad. Sure, but Mincy shouldn't be the floor. Mincy stands for the fact that that's a factor to consider in the totality of the circumstances, and I'm not willing to concede that the defendant's condition here was significantly less serious than that of Mr. Mincy. I mean, Mr. Martinez was seriously and traumatically injured here and was on powerful pain killers, and I think Mincy is very relevant to the consideration of this Court in this case, and considering whether the state met its burden of proving that these statements were voluntary. And for that reason, I was asked this Court to reverse the judgment below and remand this cause for a new trial where the Thank you. All right. Again, thank you, counsel, for argument. We will make a decision in this matter in due course. We're going to stand in recess to prepare for our next argument. Thank you.